1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

9

10

11 CATHERINE A. DIMAURO,

Plaintiff,

12

v.

13

14 MICHAEL J. ASTRUE, Commissioner
of the Social Security Administration,

15

Defendant.

16

CASE NO. 10cv5593-RBL-JRC

REPORT AND
RECOMMENDATION ON
PLAINTIFF'S COMPLAINT

NOTING DATE: December 2, 2011

17

18

19

20

21

This matter has been referred to United States Magistrate Judge J. Richard

Creatura pursuant to 28 U.S.C. § 636(b)(1) and Local Magistrate Judge Rule MJR

4(a)(4), and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261,

271-72 (1976).  This matter has been fully briefed (see ECF Nos. 18, 19, 20).

22

Based on the relevant record, the Court concludes that the ALJ failed to consider

23

properly the medical evidence regarding plaintiff's physical and mental impairments.

24

Therefore, the undersigned recommends that this matter be reversed and remanded to the administration for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

BACKGROUND

Plaintiff, CATHERINE A. DIMAURO, was born in 1958 and was forty-seven years old on her alleged disability onset date of June 20, 2005 (Tr. 40, 128). She worked as a manager at McDonalds for seven to eight years (Tr. 40-41, 264). Then, she "couldn't do it anymore" (see Tr. 264). Her departure from the workforce was precipitated when she woke up one morning and "saw a spot in [her] eye. They said it was an ulceration" (id.). She also claims that she left the workforce due to her knee problems (id.).

PROCEDURAL HISTORY

Plaintiff filed applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) in 2005, alleging that she had been disabled since June 20, 2005 (Tr. 128-35). Her applications were denied initially and following reconsideration (Tr. 72-83, 86-90). Plaintiff requested a hearing on June 14, 2006 (Tr. 91), which was held before Administrative Law Judge Milbern J. Adams "(the ALJ") on September 29, 2008 (Tr. 33-65).

On October 28, 2008, the ALJ issued a written decision in which he found that plaintiff was not disabled (Tr. 16-31). On June 18, 2010, the Appeals Council denied plaintiff's request for review, making the written decision by the ALJ the final agency decision subject to judicial review (Tr. 1-3). See 20 C.F.R. § 404.981. While plaintiff's appeal was pending before the Appeals Council, she filed new applications for benefits

and was determined to be disabled beginning January 27, 2009 (see Opening Brief, ECF No. 18, Appendix 1, pp. 1-4).

In August, 2010, plaintiff filed a complaint seeking judicial review of the ALJ's written decision (see ECF Nos. 1, 3). Because plaintiff was determined to be disabled beginning January 27, 2009, this complaint concerns plaintiff's claims of disability from her alleged onset date of June 20, 2005, through January 26, 2009 (see Opening Brief, ECF No. 18, Appendix 1, pp. 1-4). In her opening brief, among other things, plaintiff contends that the ALJ failed: (1) to evaluate properly the medical evidence; (2) to evaluate properly plaintiff's credibility; (3) to evaluate properly the lay witness evidence; (4) to determine properly plaintiff's residual functional capacity; and, (5) to develop the record fully and fairly (see ECF No. 18, pp. 14-24).

## STANDARD OF REVIEW

Plaintiff bears the burden of proving disability within the meaning of the Social Security Act (hereinafter "the Act"). Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999); see also Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). The Act defines disability as the "inability to engage in any substantial gainful activity" due to a physical or mental impairment "which can be expected to result in death or which has lasted, or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Plaintiff is disabled under the Act only if plaintiff's impairments are of such severity that plaintiff is unable to do previous work, and cannot, considering the plaintiff's age, education, and work experience, engage in any other

substantial gainful activity existing in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); see also Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Pursuant to 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits if the ALJ's findings are based on legal error or not supported by substantial evidence in the record as a whole. Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005) (citing Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1999)). "Substantial evidence" is more than a scintilla, less than a preponderance, and is such "'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989) (quoting Davis v. Heckler, 868 F.2d 323, 325-26 (9th Cir. 1989)); see also Richardson v. Perales, 402 U.S. 389, 401 (1971). The Court "'must independently determine whether the Commissioner's decision is (1) free of legal error and (2) is supported by substantial evidence.'" See Bruce v. Astrue, 557 F.3d 1113, 1115 (9th Cir. 2006) (citing Moore v. Comm'r of the Soc. Sec. Admin., 278 F.3d 920, 924 (9th Cir. 2002)); Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).

According to the Ninth Circuit, "[l]ong-standing principles of administrative law require us to review the ALJ's decision based on the reasoning and actual findings offered by the ALJ - - not post hoc rationalizations that attempt to intuit what the adjudicator may have been thinking." Bray v. Comm'r of SSA, 554 F.3d 1219, 1226-27 (9th Cir. 2009) (citing SEC v. Chenery Corp., 332 U.S. 194, 196 (1947) (other citation omitted)); see also Stout v. Commissioner of Soc. Sec., 454 F.3d 1050, 1054 (9th Cir. 2006) ("we cannot affirm the decision of an agency on a ground that the agency did not

invoke in making its decision") (citations omitted). In the context of social security appeals, legal errors committed by the ALJ may be considered harmless where the error is irrelevant to the ultimate disability conclusion. Stout, supra, 454 F.3d at 1054-55 (reviewing legal errors found to be harmless).

### DISCUSSION

The ALJ must provide "clear and convincing" reasons for rejecting the un-contradicted opinion of either a treating or examining physician or psychologist. Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995) (*citing* Baxter v. Sullivan, 923 F.2d 1391, 1396 (9th Cir. 1991); Pitzer v. Sullivan, 908 F.2d 502, 506 (9th Cir. 1990)). Even if a treating or examining physician's opinion is contradicted, that opinion "can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record." Lester, supra, 81 F.3d at 830-31 (*citing* Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995)). The ALJ can accomplish this by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Reddick, supra, 157 F.3d at 725 (*citing* Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).

In addition, the ALJ must explain why his own interpretations, rather than those of the doctors, are correct. Reddick, supra, 157 F.3d at 725 (*citing* Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)). However, the ALJ "need not discuss *all* evidence presented." Vincent on Behalf of Vincent v. Heckler, 739 F.2d 1393, 1394-95 (9th Cir. 1984) (per curiam). The ALJ must only explain why "significant probative evidence has been rejected." Id. (*quoting* Cotter v. Harris, 642 F.2d 700, 706-07 (3d Cir. 1981)).

An examining physician's opinion is "entitled to greater weight than the opinion of a nonexamining physician." Lester, supra, 81 F.3d at 830 (citations omitted); see also 20 C.F.R. § 404.1527(d). A non-examining physician's or psychologist's opinion may not constitute substantial evidence by itself sufficient to justify the rejection of an opinion by an examining physician or psychologist. Lester, supra, 81 F.3d at 831 (citations omitted). However, "it may constitute substantial evidence when it is consistent with other independent evidence in the record." Tonapetyan, supra, 242 F.3d at 1149 (citing Magallanes, supra, 881 F.2d at 752). "In order to discount the opinion of an examining physician in favor of the opinion of a nonexamining medical advisor, the ALJ must set forth specific, *legitimate* reasons that are supported by substantial evidence in the record." Van Nguyen v. Chater, 100 F.3d 1462, 1466 (9th Cir. 1996) (citing Lester, supra, 81 F.3d at 831).

1. The ALJ committed legal error in his evaluation of the medical evidence.

a. Plaintiff's physical limitations

Dr. Louis Enkema, M.D. ("Dr. Enkema"), examining physician, examined plaintiff on September 15, 2005 (see Tr. 254-62). Dr. Enkema reviewed some of plaintiff's medical records (see Tr. 254). Among other things, Dr. Enkema observed and noted plaintiff's joint pain and "swelling, particularly in the larger joints, most notably the left knee more than the right knee, but also involving the hips, elbows and shoulders" (Tr. 257). Dr. Enkema performed a thorough physical examination and observed that plaintiff was able to "mount and descent from the examination table with moderate

difficulty" (see Tr. 258-61). He opined that she was "a credible source of information" (Tr. 258).

Dr. Enkema assessed that plaintiff had a positive Romberg test and that "heel-knee is difficult for the claimant to perform and thus difficult to interpret" (Tr. 259). He assessed that her range of motion was "remarkably limited" (id.). However, he opined that his "own subjective sense is that in some measure the claimant's complaints and poor performance are an exaggeration of her problems and symptoms" (id.). Plaintiff's range of motion regarding flexion was approximately 30 degrees and was "markedly reduced" (Tr. 259-60). Dr. Enkema diagnosed plaintiff with "Extensive degenerative joint disease with particular involvement of the left knee, the hips, and the low back; Small corneal ulcer with recent infection and progressive loss of visual acuity, OD greater than OS; Fatigue; [and] Obesity" (Tr. 261).

Dr. Enkema provided a detailed functional assessment (see Tr. 261-62). Among other things, he assessed that although plaintiff "uses a cane at this time, a walker or even a wheelchair may be more appropriate in view of her apparent instability, easy fatigability, and lack of endurance when standing or walking" (id.). Dr. Enkema also assessed that plaintiff had "marked postural limitations based on the findings in the course of the physical examination and based on her history of swelling" (Tr. 262). He specifically opined that "[b]ending, stooping, crouching, climbing, kneeling, balancing, crawling and pulling are all nearly impossible for this claimant" (id.). He further opined that plaintiff was limited to stooping and bending "10% or less of her time working" (id.).

The ALJ gave "significant weight to Dr. Enkema's opinion because [he determined that] it is supported by a comprehensive physical examination" (Tr. 28). The ALJ noted that plaintiff underwent total bilateral knee replacement after the examination by Dr. Enkema and that she thereafter demonstrated an increased range of motion (id.). The ALJ also noted that like Dr. Enkema, the State agency "single decisionmaker also identified additional postural and environmental restrictions" (id. (*citing* Exhibit 10F [Tr. 288-95])). The opinion by this non-examining State agency consultant, Ms. Janina M. Oestreich ("Ms. Oestreich"), was affirmed by non-examining physician Dr. Robert Hoskins, M.D. ("Dr. Hoskins"), as noted by the ALJ, and was given "significant weight" on the basis of generally consistency "with the medical evidence and the claimant's activities" (Tr. 28; see also Tr. 320).

However, the ALJ discounted the findings by Ms. Oestreich, Dr. Enkema and Dr. Hoskins regarding plaintiff's postural and environmental restrictions in reliance on Social Security Ruling ("SSR") 85-15, which the ALJ indicated "states that postural and environmental restrictions do not significant (sic) erode the sedentary occupational base" (Tr. 28). There are a number of problems with this rejection by the ALJ of plaintiff's postural and environmental limitations.

First, plaintiff contends that the ALJ misinterpreted SSR 85-15 (see Opening Brief, ECF No. 18, p. 17). Defendant fails to respond to this argument, and instead simply reiterates the ALJ's interpretation that SSR 85-15 "states that postural and environmental restrictions do not significantly erode the sedentary occupational base" (see Response, ECF No. 19, p. 9).

SSR 85-15 does not appear to have been interpreted by the ALJ, or by defendant, with complete accuracy. One of the relevant portions of SSR 85-15 provides that if "a person can stoop occasionally (from very little up to one-third of the time) in order to lift objects, the sedentary and light occupational base is virtually intact." SSR 85-15, 1985 SSR LEXIS 20 at *18. However, another relevant portion provides that limitations in "climbing and balancing can have varying effects on the occupational base, depending on the degree of limitation and the type of job . . . . Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work." Id. at *17.

Neither Dr. Hoskins, Ms. Oestreich, nor Dr. Enkema, opined that plaintiff's limitations in climbing and balancing were her only limitations (see Tr. 262, 290, 320). In contrast, Dr. Enkema specifically opined that "[b]ending, stooping, crouching, climbing, kneeling, balancing, crawling and pulling are all nearly impossible for this claimant" (Tr. 262). In addition, SSR 85-15 does not appear to indicate specifically that limitations on pulling do not significantly erode the sedentary occupational base. See SSR 85-15, 1985 SSR LEXIS 20.

In addition, the ALJ appears to have presumed that Ms. Oestreich was a physician (see Tr. 29). Plaintiff contends that the ALJ was mistaken in this presumption (see Opening Brief, ECF No. 18, p. 18). Defendant again fails to respond to this contention, and again repeats the ALJ's presumption by referring to Ms. Oestreich as "Janina Oestreich, M.D." and "Dr. Oestreich" (see Response, ECF No. 19, p. 10 (citing Tr. 270-73)).

The Court is unable to credit the presumption by the ALJ and defendant that Ms. Oestreich is a physician, as her signatures do not indicate a doctoral degree (see Tr. 272, 274, 295). This lapse contrasts with other signatures in the record that regularly indicate the credentials of the doctor (see, e.g., Tr. 262, 263, 269, 274, 319, 320, 325, 340, 429, 430, 432).

The Court also notes that although plaintiff underwent bilateral knee replacements and Dr. W. Brandt Bede, M.D. ("Dr. Bede") assessed that her range of motion was greater than that assessed by Dr Enkema previously, Dr. Bede did not provide a functional analysis and gave no opinion regarding plaintiff's ability to bend, stoop, crouch, climb, kneel, balance, crawl or pull (see Tr. 426).

For these reasons and based on the relevant record, the Court concludes that the ALJ failed to evaluate properly the medical evidence regarding plaintiff's physical impairments and that the ALJ's decision is not supported by substantial evidence in the record. Therefore, the final agency decision here should be set aside and this matter should be reversed and remanded to the Commissioner for further consideration. See Bayliss v. Barnhart, 427 F.3d at 1214 n.1.

b. Plaintiff's mental impairments

i. Dr. Lisa Cosgrove, D.O. ("Dr. Cosgrove"), examining doctor

Dr. Cosgrove examined plaintiff on October 14, 2005 (see Tr. 264-69). She assessed that plaintiff appeared somewhat older than her stated age and that she appeared tired and pale (Tr. 264). Dr. Cosgrove indicated plaintiff's assertion that plaintiff got along okay with other people and had never been terminated from a position due to

difficulty getting along with other people (Tr. 265). She also indicated plaintiff's self-report of continued depression with chronic depressed mood without any remission for many years, as well as a history of one suicidal gesture (id.). Dr. Cosgrove further indicated plaintiff's self-report of a history of cutting herself, as well as difficulty with focus and concentration (id.).

Dr. Cosgrove conducted a mental status examination (Tr. 266-68). She observed that plaintiff appeared "tired but not markedly psychomotor retarded, although minimally" (Tr. 266). Dr. Cosgrove assessed plaintiff's mood as depressed and her affect as "restricted to blunted" (id.). Dr. Cosgrove noted that plaintiff's ability regarding her immediate memory was demonstrated by recall of 3 out of 3 objects at a one minute delay, however, plaintiff's recent memory ability was demonstrated by recall of only 1 out of 3 objects following a five-minute delay (Tr. 267). Dr. Cosgrove also opined that plaintiff had no insight into her problems (id.).

Dr. Cosgrove diagnosed plaintiff with, among other impairments, major depression, chronic, recurrent, moderate (Tr. 268). Dr. Cosgrove assessed that plaintiff's Global Assessment of Functioning ("GAF") was 46 (id.). She opined that plaintiff's prognosis was guarded to poor (id.).

Dr. Cosgrove specifically provided a functional assessment (Tr. 268-69). She opined that plaintiff had "a high probability of not being able to maintain gainful employment due to her untreated Axis I diagnoses as well as her coping style/personality traits/disorder stimulating intense fears of abandonment and difficulty with emotion modulation" (Tr. 268-69). She further opined that if plaintiff would comply with

psychotherapy and medication management, she could experience improvement and restoration as early as one year (Tr. 269).

The ALJ discounted the opinion provided by Dr. Cosgrove (see Tr. 28-29). First, the ALJ concluded that Dr. Cosgrove's opinion was not supported by the mental status examination, and mentioned only some of Dr. Cosgrove's assessments (id.). The ALJ indicated his own interpretation of plaintiff's mental status examination, concluding that plaintiff's "mental status examination indicated that she retains the mental functional capacity to perform simple, repetitive work" (id.). There is no indication that the ALJ performed his own mental status examination nor that he has any training in medicine or psychology.

The Court notes that "experienced clinicians attend to detail and subtlety in behavior, such as the affect accompanying thought or ideas, the significance of gesture or mannerism, and the unspoken message of conversation. The Mental Status Examination allows the organization, completion and communication of these observations." Paula T. Trzepacz and Robert W. Baker, The Psychiatric Mental Status Examination 3 (Oxford University Press 1993). "Like the physical examination, the Mental Status Examination is termed the *objective* portion of the patient evaluation." Id. at 4 (emphasis in original).

The Mental Status Examination generally is conducted by medical professionals skilled and experienced in psychology and mental health. Although "anyone can have a conversation with a patient, [] appropriate knowledge, vocabulary and skills can elevate the clinician's 'conversation' to a 'mental status examination.'" Trzepacz, supra, The Psychiatric Mental Status Examination 3. A mental health professional is trained to

observe patients for signs of their mental health not rendered obvious by the patient's subjective reports, in part because the patient's self-reported history is "biased by their understanding, experiences, intellect and personality" (id. at 4), and, in part, because it is not uncommon for a person suffering from a mental illness to be unaware that her "condition reflects a potentially serious mental illness." Van Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996).

Here, Dr. Cosgrove indicated her specific opinions based on her observations and plaintiff's performance during a mental status examination. The ALJ gave a different opinion regarding the results of the mental status examination (see Tr. 28-29).

When an ALJ seeks to discredit a medical opinion, he must explain why his own interpretations, rather than those of the doctors, are correct. Reddick, supra, 157 F.3d at 725; see also Blankenship, supra, 874 F.2d at 1121 ("When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation") (quoting Poulin v. Bowen, 817 F.2d 865, 873074 (D.C. Cir. 1987)).

The Court concludes that the ALJ did not explain adequately why his own interpretations, rather than those of Dr. Cosgrove, were correct. See Reddick, supra, 157 F.3d at 725. The Court also concludes that the ALJ's reinterpretation of Dr. Cosgrove's opinion regarding plaintiff's mental status examination does not provide much support for the ALJ's decision to discount the opinion by Dr. Cosgrove (see Tr. 28-29).

The ALJ further supported his determination to discount Dr. Cosgrove's opinion by finding that plaintiff's activities suggested that she had a greater mental functioning than alleged (<u>see</u> Tr. 29). The ALJ indicated that although plaintiff reported to Dr. Cosgrove that she did not have any friends or engage in any social activities, she had informed Dr. Enkema one month earlier "that she saw friends or others who visited her and that she kept in close communication with her mother and other family members" (Tr. 29). However, the report from Dr. Enkema indicated that plaintiff "may see friends or others visiting her from Vancouver, Washington" (Tr. 256).

The record is ambiguous as to whether or not plaintiff ever saw such friends or others. The ALJ has a duty to develop the record if it is ambiguous, therefore the ALJ should have asked plaintiff at the hearing whether or not she decided to see such individuals before relying on this potential fact in order to discount a doctor's opinion. <u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150 (9th Cir. 2001) (<i>quoting</i> <u>Smolen v. Chater</u>, 80 F.3d 1273, 1288 (9th Cir. 1996)). This duty to develop the record is heightened where, as was the case here, a claimant is not represented by counsel at her hearing. <u>See</u> <u>Tonapetyan</u>, <u>supra</u>, 242 F.3d at 1150 (<i>citing</i> <u>Cox v. Califano</u>, 587 F.2d 988, 991 (9th Cir. 1978)).

In addition, the fact that plaintiff reported to Dr. Enkema that she kept in close communication with her family members does not conflict necessarily with her report to Dr. Cosgrove that she did not have any friends or engage in any social activities. Similarly, the facts that plaintiff had a roommate, interacted with examining doctors, drove, managed her finances and played games on the computer were facts known to Dr.

Cosgrove and the record indicates that Dr. Cosgrove considered these factors when assessing plaintiff's mental functioning, as she mentioned these facts in her report and was one of the examining doctors (see Tr. 264, 267-68). Again, an ALJ must explain why his interpretations are correct over those of the doctor. See Reddick, supra, 157 F.3d at 725. Although the ALJ mentions these facts, he does not explain why his interpretations of these facts are more correct that the interpretation of these facts by Dr. Cosgrove.

For these reasons, the Court concludes that the ALJ's finding that plaintiff's activities suggested that she had a greater mental functioning than alleged does not provide much support for his discounting of Dr. Cosgrove's opinion.

Finally, the ALJ supports the discounting of Dr. Cosgrove's opinion by indicating that Dr. Cosgrove's medical opinion was "further rejected to the extent that she relied on the claimant's subjective complaints" (Tr. 29). There is no indication that Dr. Cosgrove relied on plaintiff's subjective complaints over the objective evidence gleaned from her mental status examination of plaintiff when making her assessment of plaintiff's functional ability. Therefore, the Court concludes that this factor does not provide much support for the discounting of Dr. Cosgrove's opinion.

For the aforesaid reasons, the Court concludes that the ALJ's determination to discount Dr. Cosgrove's opinion is not supported by substantial evidence in the record as a whole. The Court also concludes that the ALJ did not evaluate properly Dr. Cosgrove's opinion.

ii.  Ms. Oestreich, non-examining, State agency consultant

On November 3, 2005, Ms. Oestreich reviewed some of plaintiff's records and provided residual functional capacity assessments (see, e.g., Tr. 270-74). She opined that plaintiff was moderately limited in her ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to respond appropriate to changes in the work setting; and, to set realistic goals or make plans independently of others (Tr. 270-71). In the narrative portion of her assessment, she opined that plaintiff could not work with the general public due to her symptoms (Tr. 272).

The ALJ included the following discussion regarding the mental residual functional capacity assessment provided by Ms. Oestreich:

> The undersigned gives significant weight to the State agency opinion because it is generally consistent with the evidence and the claimant's activities. However, the undersigned finds that the claimant retains the ability to have incidental contact with the general public, such as a one-on-one client situation as in over the telephone. The claimant has been able to get along with her roommate and family members and interact appropriately with examiners.

(Tr. 29).

First, it is not clear why an ability to get along with a roommate and family members and an ability to interact appropriately with examining doctors demonstrates an ability to work with the general public. In addition, it is not clear that substantial evidence

in the record supports a finding that plaintiff had the ability to get along with her roommate and family members.

Second, the Court already has discussed the lack of evidence in the record regarding the ALJ's reference to Ms. Oestreich as Dr. Oestreich, M.D. <u>See</u> <u>supra</u>, section 1.a. The ALJ's characterization of Ms. Oestreich's credentials as those of a medical doctor, while perhaps correct, is not a finding based on substantial evidence in the record. (<u>see</u> Tr. 272, 274, 295; <u>see also</u>, Tr. 262, 263, 269, 274, 319, 320, 325, 340, 429, 430, 432).

Third, although the ALJ indicated that "Dr. Oestreich noted that the claimant performed fairly well during the mental status examination," Ms. Oestreich was a non-examining, reviewing source and did not conduct a mental status examination (Tr. 29, 272). It appears that Ms. Oestreich, who may not have any medical credentials, was providing an opinion regarding plaintiff's performance on the mental status examination that differed from the doctor who actually performed the examination. It is unclear whether or not the ALJ considered this factor, especially given the fact that the ALJ referred to Ms. Oestreich as Dr. Oestreich and indicated that he was under the impression that she had obtained a medical degree (<u>see</u> Tr. 29).

For these reasons and based on the relevant record, the Court concludes that the ALJ's evaluation of the mental residual functional capacity assessment provided by Ms. Oestreich was not supported by substantial evidence in the record as a whole.

  iii. Dr. Debra A. Brownlee, Ph.D. ("Dr. Brownlee"), treating psychologist

In addition, the Court notes that Dr. Brownlee examined and evaluated plaintiff on multiple occasions, including February 10, 2006 (see Tr. 401, 407-09); May 5, 2006 (see Tr. 395-96); June 30, 2006 (see Tr. 389-90); July 18, 2006 (see Tr. 387-88); August 7, 2006 (see Tr. 383-84); October 30, 2006 (see Tr. 377-78); November 29, 2006 (see Tr. 374-75); January 3, 2007 (see Tr. 368-69); and, March 12, 2007 (see Tr. 364-65). Dr. Brownlee conducted mental status examinations (see, e.g., Tr. 407-09), and provided medical opinions, including specific assessments of plaintiff's functional impairments (see, e.g., Tr. 408-09). For example, Dr. Brownlee opined that plaintiff was moderately impaired in her judgment and insight and that she suffered from a high degree of impairment with respect to her mood symptoms (see Tr. 408). Dr. Brownlee diagnosed plaintiff with posttraumatic stress disorder and severe major depressive disorder and assessed plaintiff's GAF at 50 (Tr. 409).

Dr. Brownlee noted problems that plaintiff was having with her medications (see Tr. 387, 389). On June 30, 2006 plaintiff reported that although she was not suffering from side-effects, her anti-depression medication did not appear to be working at the current dosage (Tr. 389). She indicated that she would discuss the dosage with her primary care provider (id.). On July 18, 2006, plaintiff indicated that she was suffering headaches from her pain medication and had discontinued such medication for this reason and because of fear of addiction (Tr. 387). She also ceased taking her anti-depression medication because she hid it to keep it away from her son, and then was unable to locate it (id.).

On January 3, 2007, Dr. Brownlee assessed that plaintiff demonstrated "significant difficulty focusing and concentrating on conversation and was notably tired" (Tr. 368). Dr. Brownlee's progress notes also indicates "ongoing relationship issues with family members and feelings of abandonment," quoting plaintiff's feelings that even her mother didn't care about her problems (Tr. 383). Dr. Brownlee subsequently again noted plaintiff's difficulties in this area and indicated that plaintiff was struggling "to keep the connections between herself and her family members" (Tr. 374).

Despite the on-going treatment relationship Dr. Brownlee had with plaintiff, the ALJ discussed the evaluations by Dr. Brownlee only briefly and did not specify what weight, if any, was given to her opinions (see Tr. 22-23, 26). However, an ALJ's decision must "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the [] opinion." SSR 96-2p, 1996 SSR LEXIS 9. For example, the ALJ failed to mention the indications in Dr. Brownlee's progress reports of plaintiff's "ongoing relationship issues with family members" (Tr. 383) and her struggles "to keep the connections between herself and her family members" (Tr. 374). Yet, the ALJ relied on plaintiff's "close communication with her mother and other family members" as a reason to discount Dr. Cosgrove's opinion.

The Court already has concluded that this matter should be reversed and remanded to the Commissioner for further evaluation. See supra, section 1.a. Following remand, the assessments by Dr. Brownlee should be evaluated further, and if necessary, the record

should be developed regarding Dr. Brownlee's opinion regarding plaintiff's specific mental residual functional capacity and her functional limitations.

For these reasons and based on the relevant record, the Court concludes that the ALJ failed to evaluate properly the medical evidence regarding plaintiff's mental impairments and that the ALJ's decision is not supported by substantial evidence in the record. The Court already has concluded that the ALJ's decision should be set aside and that this matter should be remanded to the Commissioner of Social Security for further consideration. See supra, section 1.a. The ALJ's evaluation of plaintiff's mental impairments provides an independent basis to set aside the ALJ's decision.

2. The Administrative Law Judge assigned to this matter following remand should assess anew plaintiff's credibility.

When making findings regarding a claimant's credibility and determining the extent to which symptoms affect a claimant's capacity to perform basic work activities, an ALJ should consider the objective medical evidence. See 20 C.F.R. § 404.1529(c)(4); see also 20 C.F.R. § 404.1529(c)(2). The Court already has determined that the ALJ in this matter failed to evaluate properly the medical evidence regarding plaintiff's physical and mental impairments and functional limitations, see supra, section 1. In addition, the Administrative Law Judge assigned to this matter following remand may assess differently plaintiff's credibility following a proper evaluation of the medical evidence. For these reasons and based on the relevant record, the Court concludes that the Administrative Law Judge assigned to this matter following remand should assess anew plaintiff's credibility.

3. The ALJ assigned to this matter following remand should assess anew the lay statements.

The Court already has determined that the ALJ in this matter failed to evaluate properly the medical evidence regarding plaintiff's physical and mental impairments and functional limitations, see supra, section 1. In addition, the Administrative Law Judge assigned to this matter following remand may assess differently the lay statements following a proper evaluation of the medical evidence. For these reasons and based on the relevant record, the Court concludes that the Administrative Law Judge assigned to this matter following remand should assess anew the statements provided by lay sources.

4. The ALJ assigned to this matter following remand should assess anew plaintiff's residual functional capacity ("RFC").

The determination regarding a claimant's RFC greatly depends on the medical evidence, which this Court has already concluded was evaluated improperly by the ALJ. In addition, the Administrative Law Judge assigned to this matter following remand may assess differently plaintiff's RFC following a proper evaluation of the medical evidence. For these reasons and based on the relevant record, the Court concludes that the Administrative Law Judge assigned to this matter following remand should assess anew plaintiff's RFC.

5. This matter should be remanded for a new hearing and a new decision.

The Ninth Circuit has put forth a "test for determining when evidence should be credited and an immediate award of benefits directed." Harman v. Apfel, 211

F.3d 1172, 1178, 2000 U.S. App. LEXIS 38646 at **17 (9th Cir. 2000). It is

appropriate where:

> (1) the ALJ has failed to provide legally sufficient reasons for
> rejecting such evidence, (2) there are no outstanding issues that
> must be resolved before a determination of disability can be made,
> and (3) it is clear from the record that the ALJ would be required
> to find the claimant disabled were such evidence credited.

Harman, 211 F.3d at 1178 (*quoting* Smolen v. Chater, 80 F.3d 1273, 1292 (9th

Cir.1996)).

Here, outstanding issues must be resolved. See Smolen, 80 F.3d at 1292. There is

a large volume of medical and other evidence, and much in the record is contradicted. In

addition, additional evidence was submitted to the Appeals Council by plaintiff after she

obtained counsel.

The ALJ is responsible for determining credibility and resolving ambiguities and

conflicts in the medical evidence. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998);

Andrews v. Shalala, 53 F.3d 1035, 1043 (9th Cir. 1995). If the medical evidence in the

record is not conclusive, sole responsibility for resolving conflicting testimony and

questions of credibility lies with the ALJ. Sample v. Schweiker, 694 F.2d 639, 642 (9th

Cir. 1999) (*quoting* Waters v. Gardner, 452 F.2d 855, 858 n.7 (9th Cir. 1971) (*citing*

Calhoun v. Bailar, 626 F.2d 145, 150 (9th Cir. 1980))).

Therefore, remand is appropriate to allow the Commissioner the opportunity to

consider properly all of the medical evidence as a whole and to incorporate the properly

considered medical evidence into the consideration of plaintiff's credibility and residual

functional capacity. See Sample, 694 F.2d at 642. Remanding the matter also will allow the Commissioner the opportunity not only to reconsider its decisions at steps two through five of the sequential disability evaluation, but also to consider fully the evidence plaintiff submitted to the Appeals Council. Plaintiff should be afforded a new hearing and should be allowed to present new evidence and arguments at her hearing.

CONCLUSION

The ALJ failed to consider properly the medical evidence regarding plaintiff's physical and mental impairments. Based on this reason and the relevant record, the undersigned recommends that this matter be **REVERSED** and **REMANDED** to the administration for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **JUDGMENT** should be for **PLAINTIFF** and the case should be closed.

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections will result in a waiver of those objections for purposes of de novo review by the district judge. See 28 U.S.C. § 636(b)(1)(C). Accommodating the time limit imposed by Rule 72(b), the clerk is directed to set the matter for consideration on December 2, 2011, as noted in the caption.

Dated this 8th day of November, 2011.

J. Richard Creatura
United States Magistrate Judge